IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CANDICE CURRY, on her own behalf:
and on behalf of all others
similarly situated             :

      v.                       :   Civil Action No. DKC 19-3467

                           :

MONEY ONE FEDERAL CREDIT UNION,
et al.                         :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this consumer-protection case are: (1) a joint motion for final approval of a class action settlement agreement between Plaintiff Candice Curry, Defendants Money One Federal Credit Union ("Money One") and Silverman Theologou, LLP ("Silverman Theologou"), and Third-Party Defendant Innovative Strategic Solutions, LLC, doing business as CU Collections ("CU Collections") (collectively "Defendants"), and (2) a motion filed by Plaintiff to approve *cy pres* recipients, an incentive award, attorney's fees, and costs.  (ECF Nos. 48; 49). A fairness hearing was held.  For the reasons stated here and in the accompanying Order, the motions will be granted, with changes to the incentive award and attorney's fees, and the case dismissed.

## I.  Background

Money One financed, and later repossessed and sold, Ms. Curry's and other Maryland consumers' motor vehicles.  (ECF No. 1, ¶ 3).  Ms. Curry alleges that, between December 5, 2015 and January

21, 2019, Money One, through its agent, CU Collections, provided borrowers with "Post-Repossession Notices" stating that they had fifteen days to redeem their vehicles. (ECF Nos. 1, ¶¶ 6, 51; 38-1, ¶ 1.6). The Uniform Commercial Code ("UCC"), which applied to the finance contracts, (ECF No. 1, ¶ 3), permits redemption until sale and prohibits post-sale deficiency collection if a lender improperly notifies a borrower of their redemption rights. Md. Code Ann., Com. Law §§ 9-614; 9-623; 9-625.

Ms. Curry alleges that Money One, through CU Collections, nevertheless sent a "Deficiency Demand Notice" requesting payment on outstanding debt after the cars were sold. (ECF No. 1, ¶ 9). She alleges that some of the borrowers made payments on those demands. (ECF Nos. 1, ¶¶ 67-68, 72; 43, at 6-7). Ms. Curry also alleges that Silverman Theologou, a law firm that collects debts from Maryland consumers, later filed actions for deficiency judgments against some borrowers. (ECF No. 1, ¶ 10). Finally, she alleges that she and other Maryland consumers suffered damaged credit because Defendants disclosed false information to third-party credit agencies and the public. (*Id.*, ¶¶ 73, 80; ECF No. 43, at 3, 7).

On December 4, 2019, Ms. Curry filed this class action alleging violations of the UCC, Md. Code Ann., Com. Law § 9-101, *et seq.*; the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201, *et seq.*; the Maryland Consumer

2

Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101, *et seq.*; and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* (ECF No. 1, at 10-15).

In addition to other relief, Ms. Curry requested statutory damages under the UCC, damages under the MCDCA and MCPA for any deficiency charges paid, an order prohibiting Money One from collecting any deficiencies or related costs, and an order requiring Money One to "notify all credit reporting agencies to whom it reports" that the members "have a zero balance" and "removing any notation to the effect that the account has been charged off." (ECF No. 1, at 10 ¶ 54; 11 ¶ 59; 14 ¶¶ 67-68, 72; 17-18). On behalf of those sued by Silverman Theologou, she requested statutory and compensatory damages under the FDCPA. (*Id.*, at 15, ¶¶ 78-79; 18).

Money One and Third-Party Defendant CU Collections answered and asserted various defenses, including that Ms. Curry failed to state a claim, failed to establish the requirements for a class action, and lacked standing. (*See generally* ECF Nos. 8; 18). Silverman Theologou moved to dismiss for failure to state a claim because CU Collections also sent Ms. Curry "Redemption Notices" before sale that satisfied Maryland law and because she did not adequately allege that Silverman Theologou knew the deficiency actions were prohibited. (ECF No. 19-1, at 1, 6-13, 17-19; *see* ECF Nos. 19-2; 19-3 (Redemption Notices)). The company also

asserted, among other arguments, that the FDCPA claims were barred by a one-year statute of limitations. (*Id.*, at 1-2, 13-15).

The parties consented to private mediation and the case was stayed. (ECF Nos. 21, 25). Mediation discovery was exchanged, and the parties participated in arms-length negotiations with experienced counsel and a seven-hour mediation with the Honorable Barbara Kerr Howe. (See ECF Nos. 34; 38, at 2). They reached a proposed settlement agreement ("the Settlement Agreement" or "the Agreement"). It defines the Class, with certain exceptions, as:

> All Maryland consumers whose vehicles were repossessed and sold by Money One . . . or contractors acting on its behalf from December 5, 2015 to January 21, 2019, pursuant to a credit contract governed by [the UCC] and as to whom CU Collections sent post-repossession notices which stated that the consumers had 15 days to redeem their vehicles.

(ECF Nos. 46, at 7; 47, at 1). It contains sixty-nine Members attached to sixty-five loans. (ECF No. 48-2, ¶ 2; 49, at 8).[1]

The Agreement requires that Defendants: (1) waive all outstanding deficiencies or balances arising out of the contracts covered by the Settlement Agreement; (2) "dismiss, with prejudice, any pending lawsuits based upon an alleged deficiency or balance due with respect to any [of those] contracts"; (3) "[r]equest the deletion of any tradelines currently reported to the credit

---

[1] During the fairness hearing, Class Counsel confirmed the number of loans, which had elsewhere been counted at sixty four.

reporting agencies" on those contracts; and (4) pay $150,000 to a Settlement Fund. (ECF No. 38-1, ¶ 3.7). In consideration, Class Members agree to release Defendants from all claims or demands related to the allegations in the lawsuit, the repossession or sale of their vehicles, or Defendants' efforts to collect or report the debts under the contracts. (*Id.*, ¶¶ 2.2(m), 3.13).

This court preliminarily approved the Agreement, certified the Class, named Ms. Curry Class Representative, appointed Class Counsel, and appointed a Settlement Administrator. (ECF No. 46). Notice was issued as prescribed. (*See generally* ECF No. 48-2). All but three deceased Class Members were contacted. (*Id.*, ¶¶ 6-8). No Class Members opted-out of or objected to the Settlement Agreement. (*Id.*, ¶ 5; ECF No. 48-1, at 12). The waiver of deficiencies for all Class Members is now valued at $479,084.75. (ECF No. 49, at 8). The parties propose to distribute the Fund as follows: (1) $7,500 to Ms. Curry; (2) $89,571.90 in attorney's fees, $1,998.40 in litigation costs, and $2,179.70 in settlement costs to Class Counsel; and (3) $750 payments on each loan, made payable jointly to co-borrowers. (ECF Nos. 38-1, ¶¶ 3.7(a)(ii)(cc), 3.12, 6.1; 47, ¶ III.2; 49, at 4, 6, 15-16).[2]

---

[2] After mediation, it became clear that, at most, a handful of loans included more than one borrower. While the Agreement does not clearly state that Member payments would be per loan, it closely links the two. (ECF No. 38-1, ¶ 1.7). In addition, the parties elsewhere described the payments merely as "*pro* rata," and

Any unclaimed funds will be dispersed in equal shares to two *cy pres* recipients: the National Association of Consumer Advocates ("NACA") and the Homeless Persons Representation Project ("HPRP"). (ECF No. 38-1, ¶¶ 3.7(a)(ii)(cc), 3.10).

## II.  Final Approval

### A.  Class Certification and Settlement Agreement

Subsequent events reinforce this court's preliminary conclusion that the Class should be certified, and that the Settlement is fair, reasonable, and adequate.  First, the Class Members received due notice of the Settlement Agreement and none objected or opted-out.  Second, the parties addressed the court's questions at the fairness hearing about a possible intra-class conflict between Members who made deficiency payments and those who did not.  They clarified that no Members paid a substantial share of their outstanding debt.  Class Counsel, who is experienced in both class actions and consumer protection matters, further represented that the deficiency payments were disclosed during mediation and, in light of their modest size, she believed the agreement offered those Members meaningful relief.  Third, the court remains convinced that Class Counsel obtained a good deal for all Members after again thoroughly reviewing the Agreement and carefully considering the parties' motions and authorities cited.

---

the proposed Notice clearly stated that payments would be by loan. (ECF Nos. 38, at 5; 38-3, ¶ III.2).

The joint motion to finally certify the Class and approve the Settlement Agreement will be granted.

### B.   *Cy Pres* Recipients

Courts commonly approve *cy pres* distributions for unclaimed funds, such as the residue of a class settlement fund.   *See McDaniels v. Westlake Servs., LLC*, No. 11-cv-1837-ELH, 2014 WL 556288, at \*11 (D.Md. Feb. 7, 2014).   The distribution is designed to put the funds "to their next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." *Klier v. Elf Atochem*, 658 F.3d 468, 474 (5th Cir. 2011).   Ms. Curry moves to do that here, unopposed and consistent with the Settlement Agreement.   Class Members were notified of the *cy pres* arrangement and none objected.   The proposed recipients' use of the funds would indirectly benefit the class.   NACA is dedicated to "promoting justice for consumers" and focuses specifically on lending, debt collection, and credit reporting abuses and errors.   (ECF No. 49-1, at 1).   HPRP is a Maryland non-profit that provides "free legal services to Marylanders experiencing homelessness or those at risk of homelessness."   (ECF No. 49, at 3).   Repossession of car is likely, as Ms. Curry suggests, to increase a person's risk of homelessness.   The motion to approve the *cy pres* recipients will be granted.

**C.    Incentive Award**

Incentive awards are "fairly typical in class action cases" and are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015) (quotations omitted).   They are also appropriate if "necessary to induce" plaintiff to bring suit. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).   An award's reasonableness turns on "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.*

An incentive award is appropriate here, but in amount lower than the $7,500 proposed, (EFC No. 49, at 4).   Ms. Curry has worked hard on behalf of the Class, (*see* ECF No. 49-2), and there is no suggestion that the award might cause Ms. Curry to "compromise the interest of the class for personal gain," *see Berry*, 807 F.3d at 614 (quotation omitted).   The proposed amount, however, accounts for five percent of the Settlement Fund.   This is a larger share than courts in this district have approved in similar vehicle repossession cases.   *See McDaniels*, 2014 WL 556288, at *12 (collecting cases and approving $5,000 award which represented

less than one percent of the Fund).  A modest reduction to $6,000 is necessary.  The motion to approve the incentive award will be granted, with the change in the award amount.

### D.   Attorney's Fees

District courts may award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h).  A court must determine the best method of calculating attorney's fees to appropriately compensate class counsel.  There are two primary methods of calculating attorney's fees: (1) the "percentage of recovery" or "percentage of the fund" method; and (2) the "lodestar" method.  *Whitaker v. Navy Fed. Credit Union*, No. 09-cv-2288-RDB, 2010 WL 3928616, at *4 (D.Md. Oct. 4, 2010); *see also* 5 Newberg on Class Actions § 15:52 (5th ed. 2021).  Under the percentage method, courts look to the requested fees' share of the "overall result" obtained or achieved for the class, among other factors.  *The Kay Co. v. Equitable Prod. Co.*, 749 F.Supp.2d 455, 464 (S.D.W.Va. 2010); *Jones v. Dominion Res. Servs.*, 601 F.Supp.2d 756, 759 (S.D.W.Va. 2009).  Under the "lodestar" method, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate.  *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).  The Fourth Circuit has not adopted one approach over the other.  With either method, the goal is to make sure that counsel is fairly compensated.

Ordinarily, the percentage method is preferred in cases with a common fund awarded to class members. This approach is complicated where a settlement includes significant recovery in forms that are not easily assigned a monetary value, such as debt forgiveness. *See* 5 Newberg on Class Actions § 15:70-71 (5th ed. 2021). This makes it difficult to ensure that the percentage method accurately reflects fair compensation. For example, the amount of debt forgiven may not reflect the value of the recovery to the class because the defendant never would have attempted to collect. *See Farrell v. Bank of Am. Corp.*, 827 F.App'x 628, 632-33 (9th Cir. 2020) (Kleinfeld, J., dissenting); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D.Penn. 2000) (noting that debt forgiveness for those unable to pay "arguably does not have the same value as cash in hand"); *Clement v. Am. Honda Fin. Corp.,* 176 F.R.D. 15, 31-32 (D.Conn. 1997) (expressing skepticism that any benefit accrued to members from coupons and debt forgiveness).

At a minimum, this complication reinforces the importance of the practice, routine in common fund cases in this district, of cross-checking the results of the percentage method against those of the lodestar method. *See, e.g.*, *Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665, 681 (D.Md. 2013); 5 Newberg on Class Actions § 15:99 (5th ed. 2021). And many courts take this approach in mixed-recovery cases. *E.g.*, *Behrens v. Landmark Credit Union*, No. 17-cv-0101-JDP, 2018 WL 9801773, at *1-2 (W.D.Wis. Sept. 11,

2018); *Kaufman v. Am. Exp. Travel Related Servs. Co.*, 2016 WL 806546, at \*11-12 (N.D. Ill. Mar. 2, 2016); *Case v. French Quarter III LLC*, No. 12-cv-2804-DCN, 12-cv-2518-DCN, 2015 WL 12851717, at \*9-10 (D.S.C. July 27, 2015).  In some instances, however, the relative size of difficult-to-value recoveries may be so disproportionate that the percentage method becomes unreliable and should not be used.  *See In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 333 (3[d] Cir. 1998) (urging application of the lodestar method where "the nature of the recovery does not allow the determination of the settlement's value necessary" for the percentage method); 5 Newberg on Class Actions § 15:92 (5th ed. 2021).  Indeed, in cases featuring debt forgiveness only, courts rely exclusively on the lodestar method.  *E.g.*, *Melby v. America's MHT, Inc.*, No. 17-cv—155-M, 2018 WL 10399003, at \*2-3 (N.D.Tex.  July 5, 2018); *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 574-75 (E.D.Va. 2016).

Two difficult-to-value recoveries dominate the Agreement here: debt forgiveness and the removal of specific defaults from Class Members' credit reports.  The total amount of debt forgiven may be a poor proxy for the total value to the Class because Silverman Theologou has not filed suit against many Members, who likely faced no real risk that the debts would be enforced.  By contrast, correcting Members' credit scores could have substantial benefit, but no one has attempted to assign a dollar value to it.

11

As discussed below, this makes it impossible to identify a reliable percentage of results obtained and the court therefore looks primarily to the lodestar method.  Under that analysis, attorney's fees are appropriate, but again in an amount lower than the proposed amount, $89,571,90, (ECF No. 49, at 6).

      **1.   Percentage Method Cross-Check**

      **a)   Percent of Results Obtained**

The purpose of a percentage cross-check is to determine whether a proposed fee award is excessive relative to a rough estimate of the total value to Class Members.  In class actions of this size, courts typically approve attorney's fees up to twenty or thirty percent.  *See Singleton*, 976 F.Supp.2d at 684-85 (collecting cases).  As noted above, the Agreement includes a $150,000 settlement agreement and $479,084.75 in estimated debt forgiveness.  After accounting for the requested fees, costs, and incentive award, Class Counsel anticipates that $48,750 of the Fund will be distributed to Members in $750 per loan payments.  If simply added to the debt forgiveness amount, as Counsel urges, the total value to Class Members would be $527,834.75.  The requested fee amount represents seventeen percent of this figure.  The parties have not, however, provided enough information to identify how many members, and how much of the outstanding deficiencies, are subject to ongoing litigation.  It is possible, then, that the requested fees represent an inappropriately high share of the

recovery.  If, for example, only half the debt forgiven benefits the Class Members, the figure jumps up to thirty-one percent.  It is also troubling that the requested fees make up sixty percent of the Fund.  Given the unreliability of any percentage calculation, the court will look to the lodestar method.

      **b)    Other Factors**

It is helpful to first review other factors included in the percentage method to help inform the selection of an appropriate multiplier under the lodestar method.  Courts in this circuit applying the percentage method also consider: (1) the quality, skill, and efficiency of the attorneys involved; (2) the risk of nonpayment; (3) objections by members of the class to the settlement terms and/or fees requested by counsel; (4) awards in similar cases; (5) the complexity and duration of the case; and (6) public policy.

Taken together, the factors do not suggest that Class Counsel is entitled to a higher-than-average award, because half the factors favor a lower fee amount.  There is no risk of non-payment; awards in similar cases may be lower on a percentage basis (although this is uncertain, as discussed above); and the case features no complexities beyond those expected in any litigation and was resolved efficiently.  The other three factors may support approving the fees requested.  Class Counsel are experienced class action and consumer protection litigators who represented the

Class effectively and efficiently; and no class members objected to the Agreement.  Public policy cuts both ways – sufficient awards are necessary to encourage consumer protection suits but should not be artificially high.

    **2.   Lodestar Method**

As noted above, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate.  The court may then adjust the lodestar figure using a "multiplier" derived from a number of factors, including the benefit obtained for the settlement class, the complexity of the case, and the quality of the representation.  *See The Kay Co.,* 749 F.Supp.2d at 462.  Class Counsel claims a lodestar of $25,365, which represents 79.3 hours billed by two attorneys at rates ranging from $275 to $525 per hour and two paralegals at a $125 per hour rate.  (ECF Nos. 49, at 15; 49-3).  Class Counsel's lodestar incorporates 15 hours expected to be billed by one attorney at a $325 rate during settlement implementation.  These are consistent with local rates according to District of Maryland guidance.  Ms. Santoni's $525 billing rate in 2021 is somewhat above the expected range but is acceptable given her 35 years of experience and limited overall billings in this case.

Class Counsel's fee request requires application of an approximate 3.53 multiplier.  Courts generally apply lodestar

multipliers between 2 and 4.5 to reach a reasonable attorneys'
fee. *See Goldenberg v. Marriott PLP Corp.*, 33 F.Supp.2d 434, 439
n.6 (D.Md. 1998) (highlighting range between 3 and 4.5); *In re
Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3ᵈ Cir. 2001)
("[M]ultiples ranging from one to four are frequently awarded in
common fund cases when the lodestar method is applied."). Though
within this range, a 3.53 multiplier is unreasonable in this case
given the uncertain overall value to Class Members, "technical"
nature of the violation, limited discovery, efficient settlement,
and the claims' relatively low complexity, as discussed above. In
light of these factors, a multiplier of 2.69 is more reasonable
and still well within the normal range. *See In re Microstrategy,
Inc.*, 172 F.Supp.2d 778, 789-90 (E.D.Va. 2001) (reducing fee award
from a requested percentage, which would have resulted in an award
approximately four times the lodestar figure, to a percentage that
resulted in an award 2.6 times the lodestar figure).

Class Counsel will be awarded $68,321.90. The motion to
approve the attorney's fees will be granted, with the change in
amount.

###    E.    Litigation and Settlement Costs

"It is well-established that plaintiffs who are entitled to
recover attorneys' fees are also entitled to recover reasonable
litigation-related expenses as part of their overall award."
*Kabore v. Anchor Staffing, Inc.*, No. 10-cv-3204-L, 2012 WL 5077636,

15

at *10 (D.Md. Oct. 17, 2012). Such costs may include "those
reasonable out-of-pocket expenses incurred by the attorney which
are normally charged to a fee-paying client, in the course of
providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771
(4th Cir. 1988) (internal quotations omitted). Examples include
"necessary travel, depositions and transcripts, computer research,
postage, court costs, and photocopying." *Almendarez v. J.T.T.
Enters. Corp.*, No. 06-cv-0068-JKS, 2010 WL 3385362, at *7 (D.Md.
Aug. 25, 2010) (citation omitted).

Class Counsel's request for $1,998.40 in litigation expenses
is reasonable. The submitted incurred costs and expenses include
the filing fee, mediation services, courier costs, and PACER
research fees. (ECF No. 49, at 15). The costs incurred and the
reimbursement requested appear to be reasonable and typical. Class
Counsel's request for $2,179.70 in settlement administration costs
is also reasonable. The Casey Group, the Settlement Administrator
in this case, attests that it spent $1,464.70 to perform the
substantial work of giving Class Members notice of the proposed
Settlement Agreement. (ECF No. 48-2, ¶ 9). It estimates that it
will require $715.00 to administer the Settlement Fund. (*Id.*).
The reimbursement requested is consistent with that requested in
other class actions with relatively small numbers of members.
*E.g.*, *Turner v. C.R. England, Inc.*, 14-cv-2207-PSG, 2016 WL
11758481, at *5, *9 (C.D.Cal. Apr. 18, 2016) ($3,750 for 58-member

16

class).   The motion to approve the requested litigation and settlement administration costs will be granted.

## III. Conclusion

For the foregoing reasons, the joint motion for final approval of the Settlement Agreement will be granted and Plaintiff's motion to approve *cy pres* recipients, an incentive award for the class representative, attorney's fees, and costs will be granted, with the changes in the incentive award and attorney's fee amounts. This action will be dismissed with prejudice.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

17